914          foreign clients, who would be arranging export of the goods

915          themselves.

916

917     119.     On January 26, 2004, Plaintiff began to suspect irregularities

918          with the goods which Research Electronics was exporting, as the

919          Plaintiff knew that counter-measures equipment and encryption

920          equipment was a highly controlled military item (by U.S. Law), with

921          approval times often taking weeks, and more commonly months to get

922          approved, and yet the Defendant was shipping goods within mere

923          hours of the order being paid for.

924

925     120.     Similar goods which the Plaintiff was handling for other related

926          companies would often involve an approval cycle of months, and

927          quite often the buyer would get discouraged with the delays in State

928          Department (legal) approvals and would turn to an easier to obtain

929          (albeit illegally exported) goods of the Defendant.

930

931     121.     In other cases, the Defendant was shipping goods within one to

932          two days of the order being placed, but in each case when the Plaintiff

933          asked for copies of the actual export documents to ensure that the

934    export was being done legally the Defendant refused to supply them,

935    or promised to supply them, but never did.

936

937    122.    In January 2004, though March 2004, the Plaintiff began to

938    push more strongly for shipping documents, invoices, and export

939    documents for the drop shipments, but the Defendant either would

940    provide no documentation at all, or would provide only an invoice

941    with a tracking number, but no export data.

942

943    123.    While the Plaintiff could not specifically figure out how the

944    Defendant was getting the exports approved so quickly, he

945    nonetheless suspected mischief or illegal activities on the part of the

946    Defendants, and made a formal report to the U.S. Government, even

947    though he lacked specifics of how they were doing it (he would

948    discover the full details in January 2011).

949

950    124.    In 2004 and 2005, Plaintiff went to Defendants business to

951    attend a two-week series of classes, and then a one-week course

952    relative to Defendants equipment. Prior to Plaintiff's arrival, he was

953    told that Defendant would assist him in dealing with clients to close

954    more sales and would also train Plaintiff in doing basic repairs on the

955    OSCOR such as replacing batteries and alignments and would do this

956    over a three day period over the weekend of the two week course (the

957    "service" course was to take place on Friday Afternoon, and then all

958    day on Saturday and Sunday). Contrary to Defendants representations,

959    when Plaintiff arrived he was shown how to repair broken hinges;

960    however, Defendant not only did not provide any instruction on any

961    other repair or alignment techniques as promised, Defendant did

962    everything to hide from Plaintiff anything related to repairs of the

963    OSCOR.

964

965    125.    During this training session in 2005, the Plaintiff further

966    broaches the topic of the ECCN codes and tried to get Defendant to

967    provide the ECCN codes to him in some sort of printed and signed

968    format or on letterhead, but the Defendant refused to supply such a list

969    at that time.

970

971    126.    In 2007, Defendant had developed another product, the

972    TALAN (which was based on the aforementioned CODEC of the

973    Plaintiff). Plaintiff, prior to his arrival at Defendants business, was

| 974 | told to bring photographic equipment because Defendant wanted |
| 975 | Plaintiff to take extensive photographs of the TALAN in order to |
| 976 | promote the product on the Plaintiff's web site. Prior to this date, |
| 977 | Defendant had published only computer mockups since Defendant |
| 978 | was experiencing considerable problems getting a final, production |
| 979 | model. Upon arrival, Defendant not only refused to allow photographs |
| 980 | by Plaintiff, Defendant further prohibited Plaintiff from using |
| 981 | photographs from Defendant brochures, even though Plaintiff was still |
| 982 | a manufacturer's representative. |
| 983 | |
| 984 | 127.    Over the two week course in August 2007, Plaintiff witnessed |
| 985 | the TALAN products used in the classroom and laboratories |
| 986 | exhibiting catastrophic failures due to serious design flaws, and the |
| 987 | course instructors stated to the Plaintiff that the all of the units that the |
| 988 | company was selling were having the same problems, and that all of |
| 989 | the units which the Plaintiff had sold to the FBI as eavesdropping |
| 990 | systems had been returned as defective. |
| 991 | |
| 992 | 128.    Plaintiff was told by the course instructors that the U.S. Navy |
| 993 | and the Department of Justice had funded development of the TALAN, |

994   but that deliveries were two years overdue, that there were chronic

995   failures in the field, and that the Defendant had to seek a foreign

996   company to help develop the product as they lacked both the technical

997   skills, and the technical resources to design, build, or program the

998   TALAN, despite the assurances to the U.S. Government that the

999   TALAN was being developed in-house, and fully domestically (when

1000   in fact it was not).

1001

1002   129.   In April 2007, after Plaintiff testified as a nationally recognized

1003   technical subject matter expert in TSCM and TEMPEST for the

1004   "Deepwater" Congressional Investigation for the Congressional

1005   Oversight Committee a situation unfolded which eventually resulted

1006   in the Defendant threatening to "destroy " the Plaintiff by a series of

1007   actions the Defendant initiated in August 2007.

1008

1009   130.   While attending a training course on a new product in August

1010   2007, the Plaintiff inquired of Defendant Lee Jones (sales manager)

1011   on or about August 8 or 9th 2007, as to the export status of the product

1012   as it was listed as having an ECCN of 3A992, which the Plaintiff had

1013   observed on export documents which Defendant employee Michelle

1014    Gaw was preparing both for the TALAN, and the OSC-5000, and to

1015    whom the Plaintiff had inquired as to the proper ECCN.

1016

1017    131.    Further, Michelle Gaw has posted in her office an internal

1018    document which listed all Research Electronics good as having an

1019    (now known to be illegal) ECCN of 3A992a, EAR99, or 5A991 with

1020    no mention that these were actually Munitions List Items. Plaintiff

1021    requested a copy of this document, and his request was denied.

1022

1023    132.    Plaintiff then spoke to Lee Jones about his concerns that

1024    Research Electronics was illegally exporting goods under improper

1025    ECCNs, and Lee Jones reassured that "the companies export attorney"

1026    said that the ECCNs were legal and stated that if the Plaintiff

1027    "...wished to continue to have a relationship with Research

1028    Electronics that the matter would need to be considered closed."

1029

1030    133.    Plaintiff reported these seemingly illegal exports of Controlled

1031    Munitions and of the fraudulent product ECCN and subversion of the

1032    United State Munitions List to the Department of Justice in Boston,

1033    MA in on or about early September 2007, in the form of a verbal

1034    report and face-to-face meeting and expressed his concerns about the

1035    seemingly illegal shipments being ignored by the government.

1036

1037    134.    Plaintiff asserts that the U.S. Navy secretly, and heavily funded

1038    the development of several of the Defendants products, and that the

1039    products did not function as originally specified.

1040

1041    135.    The Plaintiff asserts that this is the same pattern of retaliatory

1042    behavior by the FBI an other government agencies, which was used

1043    against Martin L. Kaiser in 1975 (and others since) after Mr. Kaiser

1044    also testified before Congress in a similar fashion about government

1045    corruption and rampant contractor fraud. This retaliation represents a

1046    long term pattern of conduct by an agency, agent, or contractor of the

1047    government in order to "pay back" or attempt to discrete the person

1048    who testified before Congress and who performing their civic duty by

1049    providing such testimony.

1050

1051    136.    Plaintiff further asserts, that this was a long term course of

1052    conduct of a continuing enterprise, though a pattern, of racketeering

1053    (including but not limited to: mail fraud, wire fraud, scheme to

1054     defraud, obstruction of justice, interference in commerce, witness

1055     tampering, whistle-blower retaliation, and monetary transactions in

1056     property derived from specified unlawful activities), and have caused

1057     injury to the business and/or property of Plaintiff.

1058

1059     137.     The project to "destroy" the Plaintiff by this Defendant thus

1060     appears to have been instituted in August of 2007, and possibly as

1061     early as July 2007.

1062

1063     138.     On July 3, 2008, Defendant Research Electronics published and

1064     disseminated a letter entitled "Price List Update, and Export

1065     Compliance Obligation Notification" with an attached letter entitled

1066     "Export Compliance Obligations for the Export of Research

1067     Electronics International (REI)" in this document the Defendant

1068     attempts to shift the responsibilities for legal compliance for the

1069     ECCN and export controls to the Dealer or MREP instead of taking

1070     responsibility for it themselves. While REI did not in fact supply a list

1071     of ECCN's in the letter, nor provide any meaningful data in regards to

1072     how the goods should be shipped or declared, this letter does mark a

1073     paradigm shift in how REI was handling exports.

1074

1075  139.    The Defendant thus tried to get dealers to export arms, using

1076       fraudulent ECCN codes supplied by the Defendant, and to trick and

1077       mislead the dealers into perpetrating fraudulent export declarations,

1078       and in effect the unlawful export of arms. This document was notable,

1079       as the Defendant had not previously published or distributed such a

1080       document, and they had previously gone to considerable effort not to

1081       address the issue in written form.

1082

1083  140.    Shortly after receipt of this July 3, 2008 letter, the Plaintiff

1084       contacted Defendant and reviewed the ECCNs that were to be used

1085       for the various products, and found that the Defendant was still using

1086       illegal and fraudulently obtained ECCN codes (from August 2007),

1087       and was told by Michelle Gaw (Research Electronic sales person) that

1088       the End User Letters that REI required were being used to obtain the

1089       actual export licenses from the government (this is now know to be

1090       false).

1091

1092    141.    The Plaintiff did not become aware of this pattern of criminal

1093    behavior of the Defendants until it manifested itself on December 1,

1094    2009, and discovered the injury to the Plaintiff at that time.

1095

1096    142.    Plaintiff asserts that this pattern of specific, organized criminal

1097    acts (in order to destroy the Plaintiff and silence a "Whistleblower"

1098    who was one of the powerful market influencers in the TSCM

1099    industry) took place from at least 2007 until the present date, but also

1100    that the conduct took place over a long period of time spanning a

1101    continuum of acts from October 2001 to the present time, and acts

1102    which form a pattern even prior to September 2001, and in fact likely

1103    dating back over a period of nearly thirty years.

1104

1105    143.    After the Plaintiff testified before Congress in April 2007, the

1106    Defendant suddenly began to complicate Plaintiff's sales by rejecting

1107    end user certificates on overseas sales of products, revealing at one

1108    point, that Defendant had "not received approval from Washington,

1109    D.C. on the end user certificate." This tactic continued to be employed

1110    by Defendant such that simple transactions often were complicated by

1111    Defendant to cause delays in the transactions resulting in Defendant

1112    capturing the client and sale and denying Plaintiff rightful

1113    commissions, or profits.

1114

1115    144.    Specifically, in February 2009, the Plaintiff contracted for the

1116    sale of over $30,000.00 of Defendants equipment to a client located in

1117    Switzerland and an ultimate destination in Uzbekistan.

1118

1119    145.    Upon receipt of payment by the Swiss client, Plaintiff properly

1120    registered the sale in accordance with the required disclosures to

1121    Defendant and immediately remitted full payment in the sum of over

1122    $20,000.00 to Defendant who received same.

1123

1124    146.    Defendant has judicially confessed that these funds were for the

1125    entirety of the order bound for Switzerland and thence to Uzbekistan,

1126    and that the transaction had been paid in full and was financially

1127    cleared for immediate shipment.

1128

1129    147.    Defendant required that the shipment of the Defendants

1130    equipment must be preceded by what is referred to as an "end user"

1131    certificate, rather than ship the purchased items to the address

1132    provided, and then repeatedly rejected the supplied documents.

1133    Plaintiff was repeatedly told that the shipment was "on the loading

1134    dock" and requiring only the end-user certificate to effect release.

1135

1136    148.    In truth in fact, under the U.S. Customs' classification of the

1137    equipment purchased at the time, no end user certificate was required.

1138    Further, neither Switzerland nor Uzbekistan required any end user

1139    certificate.

1140

1141    149.    However, had the ECCN been correct for the aforementioned

1142    equipment the actual nature of the equipment had been truthfully

1143    supplied to the U.S. Government by the Defendant, an actual License

1144    would have had to be obtained under 22 CFR, Section 121.1(b).

1145

1146    150.    Essentially the Defendant had lied to the U.S. Customs

1147    Department and the U.S. State Department to list the goods

1148    improperly. This represents a long-term scheme to defraud, and

1149    fraudulent statements by the Defendant.

1150

1151   151.   It has since been discovered that while no "end user" certificate

1152   was legally required at the time, the goods were still required by law

1153   to be shipped under a State Department issued approval (due to being

1154   on the United States Munitions List), which the Defendant had

1155   unlawfully subverted by falsely claiming the equipment was merely

1156   "general purpose test equipment" when in fact it was rather

1157   "electronic counter measures gear" which is tightly controlled and

1158   regulated by the U.S. Government.

1159

1160   152.   In order to facilitate the legitimate license from the U.S. State

1161   Department under 22 CFR, Section 121.1(b) an end user letter must

1162   be provided by the actual end user.

1163

1164   153.   Thus, while the Defendant was not properly exporting the

1165   goods with the proper approvals, the Plaintiff was providing the

1166   Defendants with the documents required to obtain proper State

1167   Department approvals, but the Defendant was not actually getting the

1168   proper approvals by the government, and indeed was providing an

1169   illusion and fraud to the Plaintiff, and repeating claiming that such

1170   licenses had in fact been obtained when in fact they had not.

1171

1172    154.    It is by this and related deceptions, that the Defendant was

1173            effecting thousands of illegal exports of arms, as a long term

1174            organized criminal enterprise, spanning at least 15 years.

1175

1176    155.    Plaintiff submits that Defendant has breached the laws of the

1177            State of Tennessee and/or of the United States by illegally possessing

1178            bugging devices as well as using those illegal bugging devices to

1179            intercept wire and/or oral communications of Plaintiff without

1180            Plaintiff's consent contrary to law, doing so within and throughout at

1181            least the past ten years while Plaintiff was on the premises of

1182            Defendants establishments in Tennessee.

1183

1184    156.    In accordance with 18 USC 3287 as the United States of

1185            America is currently at war, and the Defendants have defrauded the

1186            United States (to include the Department of Defense, Army, Navy,

1187            Marines, Air Force, Coast Guard, and related agencies) in a time of

1188            war, the Statue of Limitations has not yet started to toll for offenses

1189            committed in 2001. Nor will the statute of limitations begin to toll for

1190            seven years beyond the end of the war.

1191

1192    157.    As defendants KJB (both KJB Security International and KJB

1193            Security Products, Inc) and REI (both Research Electronics, LLC and

1194            Research Electronics, Inc.) overlaps and intermingled operations, and

1195            engaged in major fraud against the United States, all four entities

1196            individually and together form a single organized criminal enterprise,

1197            for whom the statute of limitations stopped tolling on the October 7,

1198            2001.

1199

1200    158.    For purposes of 18 USC 286 and 18 USC 371, the Defendants

1201            did conspire to defraud the U.S. Government as recently as August 5,

1202            2011 by virtue of publishing fraudulent ECCN codes to facility illegal

1203            exports. Thus the statute of limitations will not run out on this offense

1204            until August 5, 2016, notwithstanding the seven year tolling of 18

1205            USC 3287. Further, as this fraud reaches back to at least October 7,

1206            2001, all Defendants are liable for fines and damages from October 7,

1207            2001 forward to the present date, involving hundreds of million of

1208            dollars in arms smuggling, illegal sale of eavesdropping devices,

1209            notable major fraud, and racketeering operations.

1210

1211   159.   As a major ongoing fraud has been committed against the

1212   United States involving a sum in excess $1,000,000, the statute of

1213   limitations does not begin to toll until seven years after the last fraud,

1214   reaching back to the restructuring of the company back to at least the

1215   year 2002, and as there was no breach in the fraud, nor a change in the

1216   principals involved the line of continuous fraud forms a continuum

1217   back to the founding of the company in 1983.

1218

1219   160.   While the statute of limitation may not apply to criminal

1220   conduct prior to October 7, 2001, they do in fact apply after that date,

1221   and involve hundreds of million of dollars in illicit, illegal, or

1222   fraudulent transactions.

1223

1224   **CAUSES OF ACTION**

1225

1226   **COUNT ONE**
1227

1228   **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1229   **AND OTHERS NAMED HEREIN DID UNLAWFULLY**
1230   **BUILD, POSSESS, AND TRAFFIC IN ILLEGAL**
1231   **EAVESDROPPING DEVICES**
1232

1233   161.   The allegations contained in paragraphs 1 though the current

1234   paragraph, and including all of the following paragraphs, are re-

1235   alleged and incorporated as though fully set forth herein.

1236

1237   162.   Defendants Research Electronics, Thomas H. Jones, Bruce

1238   Barsumian, and others named herein, builds, imports, sells, resells,

1239   possesses, offer for sale, operates, ships in inter-state commerce, and

1240   controls illegal eavesdropping device, in violation of 18 USC 2510-

1241   2522 and in furtherance of their commercial business pursuits in

1242   violation of Federal law.

1243

1244   163.   Defendants did send through the mail, sent, or carried in

1245   interstate or foreign commerce, electronic, mechanical, or other

1246   devices, knowing or having reason to know that the design of such

1247   device renders it primarily useful for the purpose of the surreptitious

1248   interception of wire, oral, or electronic communications.

1249

1250   164.   Defendants did manufacture, assemble, possesses, or sell

1251   electronic, mechanical, or other devices, knowing or having reason to

1252   know that the design of such device renders it primarily useful for the

1253   purpose of the surreptitious interception of wire, oral, or electronic

1254   communications, and that such devices and component thereof has

1255   been sent through the mail or transported in interstate or foreign

1256   commerce.

1257

1258   165.   Defendants did possesses electronic, mechanical, or other

1259   devices, knowing or having reason to know that the design of such

1260   device renders it primarily useful for the purpose of the surreptitious

1261   interception of wire, oral, or electronic communications, and that such

1262   devices and component thereof was been used for the purposes of

1263   supporting sales of the Defendants counter-surveillance products, by

1264   way of demonstrating that the manufactures equipment would detect

1265   said surveillance devices.

1266

1267   166.   Defendants further utilized these illegal surveillance devices

1268   thousands of times in the training of students or purchasers of the

1269   Defendants counter-surveillance products.

1270

1271   167.   Defendants did place in newspaper, or magazines, or handbills,

1272   or other publication or disseminated by electronic means

1273    advertisements of electronic, mechanical, or other devices knowing or

1274    having reason to know that the design of such device renders it

1275    primarily useful for the purpose of the surreptitious interception of

1276    wire, oral, or electronic communications.

1277

1278    168.    Defendants did place advertisements and promoted the use of

1279    devices for the purpose of the surreptitious interception of wire, oral,

1280    or electronic communications, knowing the content of the

1281    advertisement and knowing or having reason to know that such

1282    advertisement will be sent through the mail or transported in interstate

1283    or foreign commerce.

1284

1285    **COUNT TWO**
1286

1287    **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1288    **AND OTHERS NAMED HEREIN DID**
1289    **ADVERTISE, SELL OR TRAFFIC IN ILLEGAL**
1290    **TRANSMITTING DEVICES**
1291

1292    169.    The allegations contained in paragraphs 1 though the current

1293    paragraph, and including all of the following paragraphs, are re-

1294    alleged and incorporated as though fully set forth herein.

1295

1296    170.    Defendants Research Electronics, Thomas H. Jones, Bruce

1297    Barsumian, and others named herein, makes, advertises, builds, sells,

1298    resells, offers for sale, operates, ships in inter-state commerce, and

1299    controls devices capable of transmitting a radio signal, or which

1300    contains a local oscillator and which transmits a RF signal which are

1301    not properly licensed, not properly certified, and/or not labeled in

1302    accordance with 47 CFR in violation of Federal law.

1303

1304    171.    FCC regulations require that any device which contains any

1305    from of local oscillator comply with a technical certification process

1306    for each design and model.

1307

1308    172.    Further, 47 CFR mandates that when a design is changed that

1309    that the holder of a previously held authorization or certification must

1310    regain though reapplication or waiver FCC permission for the new

1311    version.

1312

1313    173.    Defendants either have not done this on their products, or when

1314    they have done such registrations, they have deviated from the

1315    original design or tested sample so as to render the previous

1316    certification or authorization null and void.

1317

1318    **COUNT THREE**
1319

1320    **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1321    **AND OTHERS NAMED HEREIN DID**
1322    **ILLEGALLY EXPORT RESTRICTED ARMS**
1323

1324    174.    The allegations contained in paragraphs 1 though the current

1325    paragraph, and including all of the following paragraphs, are re-

1326    alleged and incorporated as though fully set forth herein.

1327

1328    175.    Defendants Research Electronics, Thomas H. Jones, Bruce

1329    Barsumian, and others named herein makes, builds, sells, resells,

1330    possesses, offers for sale, operates, ships in interstate and international

1331    commerce goods unlawfully that is restricted by International Traffic

1332    in Arms Regulations (ITAR) by the U.S. State Department items as

1333    controlled munitions or commodities in violation of Federal law.

1334

1335    **COUNT FOUR**
1336

1337
1338
1339
1340

## RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS, AND OTHERS NAMED HEREIN DID ILLEGALLY EXPORT RESTRICTED ARMS

1341   176.   The allegations contained in paragraphs 1 though the current

1342   paragraph, and including all of the following paragraphs, are re-

1343   alleged and incorporated as though fully set forth herein.

1344

1345   177.   Defendants unlawfully exports and exported controlled

1346   munitions and controlled devices in violation of International Traffic

1347   in Arms Regulations (ITAR) (22 CFR, Sections 120 - 130) in that

1348   they are legally defined as defense articles on the United States

1349   Munitions List (USML). Licenses are issued by the U.S. Department

1350   of State Directorate of Defense Trade Controls (DDTC).

1351          i.   Sec. 121.1 General. The United States Munitions List.
1352          ii.   "(a) The following articles, services and related technical
1353               data are designated as defense articles and defense
1354               services pursuant to sections 38 and 47(7) of the Arms
1355               Export Control Act (22 U.S.C. 2778 and 2794(7))."
1356
1357              1.   Category XI--Military [and Space] Electronics
1358              2.   "(b) Electronic systems or equipment specifically
1359                   designed, modified, or configured for intelligence,
1360                   security, or military purposes for use in search,
1361                   reconnaissance, collection, monitoring, direction-
1362                   finding, display, analysis and production of
1363                   information from the electromagnetic spectrum
1364                   and electronic systems or equipment designed or

| | |
|---|---|
| 1365 | modified to counteract electronic surveillance or |
| 1366 | monitoring." |
| 1367 | |
| 1368 | **COUNT FIVE** |
| 1369 | |
| 1370 | **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,** |
| 1371 | **AND OTHERS NAMED HEREIN DID** |
| 1372 | **DEFRAUD THE UNITED STATES GOVERNMENT** |
| 1373 | **IN REGARDS TO ILLEGAL ARMS SHIPMENTS** |
| 1374 | |
| 1375 | 178.     The allegations contained in paragraphs 1 though the current |
| 1376 | paragraph, and including all of the following paragraphs, are re- |
| 1377 | alleged and incorporated as though fully set forth herein. |
| 1378 | |
| 1379 | 179.     Research Electronics has unlawfully subverted U.S. Export |
| 1380 | restrictions of TSCM or Electronic Countermeasures equipment for at |
| 1381 | least the past ten years by repeatedly claiming that the "electronics |
| 1382 | counter-measures equipment" which they manufacture is merely |
| 1383 | "general purpose test equipment" (ECCN: 3A992) or medical |
| 1384 | equipment/not covered elsewhere (ECCN: EAR99), or "Information |
| 1385 | Security" (ECCN: 5B002) or "Telecommunications Equipment" |
| 1386 | (ECCN: 5A991) when it is in fact "electronic counter-measures |
| 1387 | equipment" as defined by Section 121.1, Category XI(b) as |

1388    "equipment designed or modified to counteract electronic surveillance

1389    or monitoring."

1390

1391    180.    Further, Research Electronics does not advertise this equipment

1392    for any function other than for the purposes of "counteracting

1393    electronic surveillance or monitoring," and the equipment is purpose

1394    built for that sole function along, and no other.

1395

1396    181.    Defendants maintain a contract with the U.S. Government to

1397    sell U.S. Government agencies (including the Department of Defense)

1398    as "Schedule Title: FSC Group 84, Part VI, Section A, Law

1399    Enforcement and Security Equipment, Contract Number: GS-07F-

1400    9566G, FSC Class: 6350" with the nature of the goods sold by

1401    Defendant listed strictly as "Special Item Numbers (SINS): 426-4N

1402    Criminal Investigative Equipment & Supplies (Bug Detection

1403    Equipment and Invisible Detection Materials.)"

1404

1405    182.    Neither does Research Electronics train students at their school

1406    on how to use this equipment for any function other then to find,

1407    locate, and to counteract eavesdropping devices.

1408

1409    183.    Further the text books used to teach the courses taught by and

1410    for the Defendants present only methods used for those purposes

1411    listed in 22 CFR Section 121.1, Category XI(b) for the purposes of

1412    "counteracting electronic surveillance or monitoring."

1413

1414    184.    Either the Defendants has defrauded the U.S. Government in

1415    regards to the good being "Bug Detection" when in fact they are not,

1416    or the Defendant has defrauded the U.S. Customs Department by

1417    claiming that the goods were not "counter-surveillance" equipment

1418    when in fact they were.

1419

1420    185.    In fact, Defendants have registered under GSA Contract

1421    Number: GS-07F-9566G the following items and specifies that these

1422    are for the purposes of "counteracting electronic surveillance or

1423    monitoring"

1424

1425    186.    Additionally, the company profile registered under the GSA

1426    Contract states that the company:

1427    "Manufactures countersurveillance eavesdropping detection
1428    (TSCM) equipment such as the TALAN Telephone and Line

1429     Analyzer, OSCOR Countersurveillance Receiver, ORION Non-

1430     Linear Junction Detector, CPM-700 Countersurveillance Probe

1431     Monitor, CMA-100 Countermeasure Amplifier, and ANG-2200

1432     Acoustic Noise-masking Generator. REI also provides

1433     Technical Surveillance Countermeasure (TSCM) training.

1434

1435 187.     The GSA Contract specifies and described several of the

1436 Defendants goods as:

1437

1438     (a) COUNTERMEASURES AMPLIFIER, CMA-100, High Gain

1439     Audio Amplifier utilized to detect and identify certain types of

1440     surveillance devices connected to building wiring.

1441

1442     (b) DELUXE COUNTERSURVEILLANCE PROBE MONITOR,

1443     CPD-700, Kit that includes CPM-700, the new 12 GHz BMP

1444     Probe and all other US available accessories.

1445

1446     (c) ACOUSTIC LEAKAGE PROBE FOR CMA, ALA-100,

1447     Detects acoustic leakage. Specifically for use with the

1448     Countermeasures Amplifier.

1449

1450 188.     On or about December 16, 2009, the defendants were caught by

1451 U.S. Customs attempting to illegally ship several OSCOR BLUE, part

1452 number OBL-24, under ECCN 3A992a, and as a result all REI

1453   shipment were "seized or delayed" enroute involving a seizure of

1454   several million dollars.

1455

1456   189.   On, or about January 15, 2010, U.S. Customs initiated

1457   additional seizures of REI exported goods due to REI export fraud,

1458   and on March 1, 2010 Research Electronics issued a letter stating "We

1459   are experiencing some unforeseen export issues with all recent export

1460   shipments"

1461

1462   **COUNT SIX**
1463

1464   **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1465   **AND OTHERS NAMED HEREIN DID**
1466   **DEFRAUD THE UNITED STATE GOVERNMENT,**
1467   **THE PLAINTIFF, OTHER DEALERS, AND EXPORTERS**
1468   **IN REGARDS TO ILLEGAL ARMS SHIPMENTS**
1469

1470   190.   The allegations contained in paragraphs 1 though the current

1471   paragraph, and including all of the following paragraphs, are re-

1472   alleged and incorporated as though fully set forth herein.

1473

1474   191.   In the aforementioned March 1, 2010 letter from Research

1475   Electronics, Thomas H. Jones fraudulently states that "We have valid

1476   export classifications by the U.S. Department of Commerce indicating

1477   no export restrictions", when in fact they had fraudulently

1478   misrepresented the function of the equipment to evade being properly

1479   categorized as under Section 121.1, Category XI(b) of the "The

1480   United Stated Munitions List", and indeed the goods are highly

1481   restricted, and highly controlled by law.

1482

1483   192.   This letter was sent by Research Electronics both by wire and

1484   by U.S. Mail, thus violating U.S. Mail fraud statutes, and engaging in

1485   a long-term course of criminal conduct and racketeering.

1486

1487   **COUNT SEVEN**
1488

1489   **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1490   **AND OTHERS NAMED HEREIN DID**
1491   **COMMIT MAIL FRAUD, FRAUD BY WIRE,**
1492   **SCHEME TO DEFRAUD, AND DID INTERFERE**
1493   **WITH INTERSTATE AND INTERNATIONAL COMMERCE.**
1494

1495   193.   The allegations contained in paragraphs 1 though the current

1496   paragraph, and including all of the following paragraphs, are re-

1497   alleged and incorporated as though fully set forth herein.

1498

1499    194.    This notice was sent out both by mail, and by wire means in

1500    violation of wire and mail fraud statues, in a scheme to defraud, and to

1501    interfere with interstate and international commerce.

1502

1503    195.    On or about March 8, 2010 and continuing to early April 2010,

1504    Research Electronics acknowledged that the OBL-24 was in fact

1505    improperly described, when they changed the ECCN to reflect that it

1506    was now a Section 121.1, Category XI(b) "Munitions List Item",

1507    which rendered the unit difficult, if not impossible for them to export

1508    without extensive licensing which they had previously been able to

1509    evade.

1510

1511                   **COUNT EIGHT**
1512

1513    **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1514    **AND OTHERS NAMED HEREIN DID**
1515    **DEFRAUD THE UNITED STATE GOVERNMENT,**
1516    **THE PLAINTIFF, OTHER DEALERS, AND EXPORTERS**
1517    **IN REGARDS TO ILLEGAL ARMS SHIPMENTS**
1518

1519    196.    The allegations contained in paragraphs 1 though the current

1520    paragraph, and including all of the following paragraphs, are re-

1521    alleged and incorporated as though fully set forth herein.

1522

1523   197.   Nevertheless, Research Electronics reintroduced the same

1524   product as the "OSCOR Blue" under a new name of the "OSCOR

1525   Green" with all of the prior features, functions, accessories, and

1526   operations that the previously seized OBL-24 "OSCOR Blue" also

1527   contained, and listed this "new model" under ECCN code 3A992a,

1528   which is in fact a Section 121.1, Category XI(b) "Munitions List Item"

1529   device.

1530

1531   198.   The only essential difference between the two units was a slight

1532   restriction in the frequency coverage, but not in the functionality as a

1533   piece of restricted "counteracting electronic surveillance or

1534   monitoring" equipment.

1535

1536   199.   Further, as this restriction in frequency coverage was induce by

1537   way of a minor software change, the hardware itself remains operable,

1538   and the software restrictions may be overridden by the end user,

1539   should they wish to do so.

1540

1541    200.    Thus, the OSCOR Blue and the OSCOR Green is essentially

1542        the same product from a hardware, and functionality perspective, with

1543        deceptive export documentation.

1544

1545                            **COUNT NINE**
1546

1547    **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1548              **AND OTHERS NAMED HEREIN**
1549    **DID ENGAGE IN MONOPOLIES AND RESTRAINT OF TRADE**
1550

1551    201.    The allegations contained in paragraphs 1 though the current

1552        paragraph, and including all of the following paragraphs, are re-

1553        alleged and incorporated as though fully set forth herein.

1554

1555    202.    This ongoing fraud by the Defendants in regards to the ECCN

1556        and Munitions List status resulted in the Defendants illegally

1557        monopolizing the industry, and forcing their honest competitors out of

1558        business.

1559

1560    203.    Defendants contracted to, engaged in, conspired to engage in,

1561        created trusts and agreements, engaged in monopolistic efforts, rigged

1562        contracts, inflated market price, price fixing, and restraint of trade

1563  among the several States, or with foreign nations, in violation of the

1564  law and contrary to public policy.

1565

1566  204.   Defendants demanded that the Realtor James M. Atkinson not

1567  deal in the goods, wares, merchandise, machinery, supplies, or other

1568  commodities of their competitor or competitors, with the effect of

1569  such lease, sale, or contract for sale or such condition, agreement, or

1570  understanding to be to substantially lessen competition or tend to

1571  create a monopoly in any line of commerce.

1572

1573  **COUNT TEN**
1574

1575  **RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS,**
1576  **AND OTHERS NAMED HEREIN DID**
1577  **ENGAGE IN VIOLATIONS OF THE CIVIL RACKETEER**
1578  **INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
1579

1580  205.   The allegations contained in paragraphs 1 though the current

1581  paragraph, and including all of the following paragraphs, are re-

1582  alleged and incorporated as though fully set forth herein.

1583

1584  206.   The Defendants have not only violated International Traffic in

1585  Arms Regulations, but they have also committed including, but not

---

Complaint for False Claims and Racketeering

1586       limited to: Wire Fraud, Mail Fraud, Scheme to Defraud, Obstruction

1587       of Criminal Investigations, Obstruction of Law Enforcement,

1588       Interference with Commerce, and Transactions in Property Derived

1589       from Specific Unlawful Activity in furtherance of this illegal

1590       exportation, and misrepresented to the federal government of the

1591       nature of their goods.

1592

1593       207.    Defendants encouraged, endorsed, organized, and/orchestrated

1594       an ongoing criminal enterprise.

1595

1596       208.    Further, this Defendant has engaged in conduct and as a

1597       continuing unit of an enterprise, through a pattern, of racketeering

1598       enterprises (including, but not limited to: mail fraud, wire fraud,

1599       scheme to defraud, robbery, kidnapping, extortion, obstruction of

1600       justice, interference in commerce, also involving monetary

1601       transactions in property derived from specified unlawful activity), and

1602       have caused injury to the business and/or property of the Plaintiff

1603       Atkinson.

1604

1605   209.   This complex scheme to defraud, and to falsely classify arms in

1606   order to export counter-surveillance equipment as mere "general

1607   purpose test equipment" and other products on the part of the

1608   Defendants has caused harm to the United States of America, to the

1609   business and property of the Plaintiff and others, represents the

1610   conduct of a continuing unit, by an enterprise, through a pattern, of

1611   prohibited activities, which resulted in income for the Defendants, and

1612   damage to the United States of America, and to Plaintiffs business and

1613   property.

1614

1615   210.   Had Defendants not engaged in this fraud, other parties would

1616   have been able to apply for such licenses, and thus to export an

1617   estimated $28,774,000 in goods, which the Defendant illegally

1618   exported to foreign customers between Jun 2007 and June 2011. As

1619   this illegal export, and violations of the RICO statutes were

1620   committed by the Defendants, trebles damages for the illegal exports

1621   alone is expected to exceed $86,322,000.

1622

| 1645 | much so that the information as to which nations are using which |
| 1646 | equipment, and how they are using or deploying the equipment is |
| 1647 | considered to be one of the greatest technological secrets a nation can |
| 1648 | maintain, and access to the equipment to perform these activities is |
| 1649 | vital to the national defense of any country on Earth. |
| 1650 | |
| 1651 | 215.    By way of export fraud Research Electronics did create |
| 1652 | uncertainty and subversion of export control policy and inhibited the |
| 1653 | efforts of United States business and worked to the detriment of the |
| 1654 | United States. |
| 1655 | |
| 1656 | 216.    As 50 U.S.C. § 2410, provides for a five fold penalty, the |
| 1657 | defendants are thus subject to a civil fine or forfeiture in the amount |
| 1658 | of $143,870,000 (based on 5 times the value of the shipments which |
| 1659 | used fraudulent ECCN codes) or $1,615,000,000 (one million dollars |
| 1660 | per transaction), as the statute requires the fine or sanction be the |
| 1661 | greater of the two, thus the fine for the four years in question will be |
| 1662 | not less then 1.615 Billion dollars. |
| 1663 | |

1664    217.    Further, under 50 U.S.C. § 2410 each person involved in the

1665        fraud is subject to a $250,000 fine and a 10-year imprisonment for

1666        each occurrence.

1667

1668    218.    Defendants are thus liable personally to a 403.75 million dollar

1669        fine each, and a prison sentence of 16,150 years each.

1670

1671    219.    An estimate of the illegal shipment beyond the four-year

1672        window, from Spring of 1995 until Spring 2007 is estimated to be

1673        approximately $83,400,000 involving 3,879 illegal shipment. This

1674        would in turn increase the proposed fine and forfeiture to 3.879

1675        Billion dollars.

1676

1677    220.    As the criminal conduct involves RICO violation, the damages

1678        and fines for the past four years are thus trebled to 4.845 Billion

1679        dollars for the company, and 1.211 Billion dollars for each of the

1680        owners, or a combined fine or sanction of 6.301 Billion dollars.

1681

1682                    **COUNT TWELVE**

1683

## RESEARCH ELECTRONICS, EMPLOYEES, OWNERS, AGENTS, AND OTHERS NAMED HEREIN DID UNLAWFULLY POSSES OR OPERATE ILLEGAL AUDIO EAVESDROPPING DEVICES

1684
1685
1686
1687

1688    221.    The allegations contained in paragraphs 1 though the current

1689            paragraph, and including all of the following paragraphs, are re-

1690            alleged and incorporated as though fully set forth herein.

1691

1692    222.    During eavesdropping-countermeasures courses taught in

1693            November 2004, October 2006, and August 2007, Plaintiff Atkinson

1694            did personally witness employees and agents of Research Electronics

1695            to be in possession of covert audio eavesdropping devices, did detect,

1696            evaluate, measure, catalog, and document these devices as fully

1697            operational, transmitting the voice and audio of the Plaintiff.

1698

1699    223.    These devices were detected to be in the manufacturing area,

1700            first floor conference room, engineering areas, and second floor

1701            training areas of the premises of the Defendant.

1702

1703    224.    In most cases, the Plaintiff was able to obtain visual contact and

1704            identification, and then to match the audio to the specific with the

1705            eavesdropping device.

225.    As most of these illegal eavesdropping devices originals in Germany, Japan, England, and Israel, it is not possible for the Defendants to acquire or to possess the devices unless they had been illegally imported in contravention of U.S. law.

226.    On 11/10/2004, Plaintiff did detect, trace, identify, correlate, and then physically confirm that Defendants was operating covert audio eavesdropping devices on the frequencies of: 53.975 MHz, 105.47 MHz, 160.995 MHz, 177.897 MHz, 303.615 MHz, 304.125 MHz, 304.245 MHz, 314.375 MHz, 314.379 MHz, 321.985 MHz, 402.14 MHz, 412.895 MHz, 412.93 MHz, 423.125 MHz, 499.975 MHz, 607.255 MHz. In each case, the signals were found to be originating from separate devices, and in each case the eavesdropping device was hidden form view and covert in nature.

227.    On 11/18/2004, Plaintiff did detect, trace, identify, correlate, and then physically confirm that Defendants was operating covert audio eavesdropping devices on the frequencies of: 673.935 MHz, 674.15 MHz, 142.15 MHz, 1013 MHz. In each case, the signals were

1726     found to be originating from separate devices, and in each case the

1727     eavesdropping device was hidden form view and covert in nature.

1728

1729     228.     On 11/19/2004, Plaintiff did detect, trace, identify, correlate,

1730     and then physically confirm that Defendants was operating covert

1731     audio eavesdropping devices on the frequencies of: 304.261 MHz,

1732     420.548 MHz, 420.55 MHz, 785 MHz, 876 MHz, 881 MHz, 893

1733     MHz, 912.775 MHz, 1205.6 MHz, 1521.25 MHz, 1521.295 MHz,

1734     1572.035 MHz, 1886.405 MHz, 2174.045 MHz, 2403.945 MHz,

1735     2409.905 MHz, 2415.855 MHz, 2472.545 MHz. In each case, the

1736     signals were found to be originating from separate devices, and in

1737     each case the eavesdropping device was hidden form view and covert

1738     in nature.

1739

1740     229.     On 11/20/2004, Plaintiff did detect, trace, identify, correlate,

1741     and then physically confirm that Defendants was operating covert

1742     audio eavesdropping devices on the frequencies of: 74.994 MHz,

1743     75.008 MHz, 75.363 MHz, 77.2 MHz, 85.92 MHz, 88.875 MHz, 99.6

1744     MHz, 647 MHz, 900 nm Infrared Audio Transmitter inside Smoke

1745     Detector. In each case, the signals were found to be originating from

1786   235.   This false claim is also made by way of a cut-out company by

1787   the name of "Absolute Surveillance" operated by Deanna Marie

1788   Wolfe, 31566 Railroad Canyon Road, Suite 709, Sun City, CA  92587.

1789

1790   236.   Defendants state as part of the contract that there are no

1791   "Foreign Items" when indeed virtually the entirety of their goods are

1792   smuggled into the United States from China, Taiwan, Japan and other

1793   countries, and then fraudulently sold to the United States as having

1794   originated inside the United States.

1795

1796   237.   On GSA Contract GS-07F-0156W the goods of this company

1797   are fraudulently listed as having a Point(s) of Production as:

1798   (a) Wanco:  Arvada, Adams and Jefferson Counties, CO

1799   (b) VCT Vision:  Covina, Los Angeles County, CA

1800   (c) KJB:  Nashville, Davidson County, TN

1801

1802   238.   These fraudulent goods have also been sold to the Department

1803   of Defense in a time of war.

1804

1805   **ON ALL COUNTS**

1806

1807   239.   Plaintiff is informed and believes that Defendant is the policy-

1808          maker and fiduciary supervisors of the remaining subordinates, agents,

1809          and employees identified hereinafter.

1810

1811   240.   Plaintiff is informed and believes that Defendants had

1812          knowledge that the wrongs hereinafter mentioned were and continue

1813          to be done; conspired with others to commit, were about to be

1814          committed, and having power to prevent or aid in preventing the

1815          commission of the same, neglected or refused so to do.

1816

1817   241.   Further, Defendants have engaged in conduct and as a

1818          continuing unit of an enterprise, through a pattern, of racketeering

1819          enterprises (including, but not limited to: mail fraud, wire fraud,

1820          smuggling, conspiracy, robbery, kidnapping, obstruction of justice,

1821          interference in commerce, also involving monetary transactions in

1822          property derived from specified unlawful activity), and have caused

1823          injury to the United States of America.

1824

1825

1826  242.    The United States of America will continue to suffer irreparable

1827          injury if the Court does not issue an immediate and emergency

1828          injunction.

1829

1830  243.    Defendant encouraged, endorsed, organized, and/orchestrated

1831          an ongoing criminal enterprise, and a widespread cover-up.

1832

1833  244.    Defendant did unlawful import, build, sell, possess, and utilize,

1834          and ship in intrastate commerce numerous illegal-bugging devices.

1835

1836  245.    Defendant recklessly endangers the life and limbs of U.S.

1837          Military forces and members of the intelligence community by selling

1838          defective equipment, and makes false claims about products.

1839

1840  246.    Defendant unlawfully makes, possesses, ships, sells, or import

1841          or exports illegal eavesdropping devices, and engages in illegal

1842          eavesdropping.

1843

1844  247.    Defendant unlawfully exports controlled munitions, arms, and

1845          controlled devices, has violated national security controls, has

1846    engaged in monopolistic practices, and whistleblower retaliation, and

1847    witness tampering.

1848

1849                              **PRAYER FOR RELIEF**

1850

1851    WHEREFORE, Plaintiff pray for the following relief:

1852

1853    1.  Immediate seizure, and civil forfeiture of all assets, real estate,

1854        businesses, bank accounts, resources, boats, aircraft, investments,

1855        intellectual property, patents, trademarks, source code, or any other

1856        thing of value in the possession or control of the Defendants as "fruits

1857        of the crime", and "monetary transactions in property derived from

1858        specified unlawful activity," instrumentalities of crime used to

1859        facilitate the an organized criminal enterprise, and tools used to

1860        defraud the United States.

1861

1862    2.  Immediate declaratory judgment and injunctive relief that the each

1863        and individually, of the aforementioned individual Defendants be

1864        immediate and as an interim step be listed in the Excluded Parties

1865        Lists System (EPLS), and eventually to be placed on the debarment

1866        list.

1867

1868    3. Immediate declaratory judgment and injunctive relief in the form of

1869        an immediate suspension of all export privileges of all products that

1870        Research Electronics, LLC or KJB Security, or any derivate company,

1871        or employee may operate.

1872

1873    4. Immediate declaratory judgment that Defendants have defrauded the

1874        United States, and issue injunctive relief, fines, sanctions, penalties, as

1875        accorded to the fullest extent of the law, dating back to the beginning

1876        of the war in October 2001, or that date determined by the court to be

1877        appropriate tolling.

1878

1879    5. Immediate declaratory judgment and injunctive relief that Defendants

1880        shall not make, build, import, sell, operate, possess in whole or in part

1881        or in any way control any manner of eavesdropping device, of any

1882        sort in violation of 18 USC 2510 - 2522, and other relief this court

1883        deems appropriate.

1884

1885    6. Immediate declaratory judgment and injunctive relief that Defendants

1886   shall not make, build, resell, offer for sale, import, sell, operate, or in

1887   any way circulate, ship, or distribute any manner any sort of device

1888   capable of transmitting a signal of any sort, or which contains a local

1889   oscillator until that product is first formally assigned a FCCID number

1890   and retail or commercial sale is approved by the FCC, for each model,

1891   each revision, and each modification as required by Federal law, and

1892   other relief this court deems appropriate.

1893

1894   7. Immediate declaratory judgment and injunctive relief that Defendants

1895   shall not make, build, resell, offer for sale, import, export, sell, operate,

1896   or in any way circulate, ship, or distribute any manner any sort of

1897   device capable of detecting eavesdropping devices or signals of any

1898   sort, unless that equipment is carefully controlled as in International

1899   Traffic in Arms Regulations (ITAR) by the U.S. State Department

1900   items and controlled munitions or commodities as required by Federal

1901   law, and other relief this court deems appropriate.

1902

1903   8. Immediate declaratory judgment and injunctive relief that Defendants

1904   shall issue a recall of all products sold in the United States, which are

1905   capable of transmitting a signal of any sort, until those units are

1906    properly certified by the FCC and a proper FCC Form 731 has been

1907    approved.

1908

1909    9.  Immediate declaratory judgment and injunctive relief that Research

1910        Electronics shall issue a recall or pay at least treble restitution to all

1911        purchasers or owners of all products made by Research Electronics

1912        located within the United State, as those products may not be legally

1913        used, and are thus useless.

1914

1915    10. Immediate declaratory judgment and injunctive relief that Research

1916        Electronics shall not make, build, resell, offer for sale, import, export,

1917        sell, operate, or in any way circulate, ship, or distribute any manner

1918        any sort of device sold as detecting hidden cellular phones or other

1919        electronics on or in the human body by means of non-ionizing

1920        radiation due to health risks and other relief this court deems

1921        appropriate.

1922

1923    11. Immediate declaratory judgment and injunctive relief that Research

1924        Electronics shall not make, build, resell, offer for sale, import, export,

1925        sell, operate, or in any way circulate, ship, or distribute any manner

1926      any sort of device sold as detecting bombs or explosive devices by

1927      means of non-ionizing radiation due to health risks and other relief

1928      this court deems appropriate.

1929

1930      12. Impose very strong punitive damages against the Research Electronics

1931      for willfully violating, infringing, and depriving Plaintiff of his civil

1932      rights, also treble damages for committing fraud against the Plaintiff

1933      and violating the RICO statutes, or an amount to be determined at the

1934      time of trial, and other relief this court deems appropriate.

1935

1936      13. Plaintiff submits that he is entitled to declaratory judgment that the

1937      clauses in MREP Agreements described herein are adhesionary and

1938      *contra bones mores* such that they are legally unenforceable, form a

1939      restraint of trade, and a monopoly.

1940

1941      14. Plaintiff submits that the United States Government is entitled to an

1942      appropriate order from this Court commanding disclosure for

1943      inspection and copying by Plaintiff and the U.S. Government of all

1944      pending order forms submitted by Plaintiff to Defendant as well as all

1945    sales records, communications relative to all sales, all shipping, and

1946    all export records of Defendant for the past ten (15) years.

1947

1948    15. Award treble actual damages both liquidated and unliquidated in an

1949    amount to be determined at the time of trial.

1950

1951    16. Impose a civil fine of 1.615 Billion Dollars against Defendants as

1952    required by 50 U.S.C. § 2410, for illegal shipments made between

1953    Spring 2007 and August 2011.

1954

1955    17. Impose a civil fine of 3.879 Billion Dollars against Defendants as

1956    required by 50 U.S.C. § 2410 for illegal shipments made between

1957    Spring of 1995 until Spring 2007.

1958

1959    18. Trebling of all fines, sanctions, penalties, and damages given the

1960    Defendants RICO violations.

1961

1962    19. Award *qui tam* Realtor, James M. Atkinson between 15% and 30% of

1963    any award, fines, or settlement amounts.

1964

1965    20. Award attorney's fees and/or costs pursuant to this action.

1966

1967    21. Damages in the amount of three (3) times the actual damages or more,

1968        suffered by the United States Government as a result of the

1969        Defendants' conduct which violated the False Claims Act.

1970

1971    22. Relator/Plaintiff be awarded attorneys fees from any Common Fund

1972        ("settlement"), if any, created for any benefits not covered by 31

1973        U.S.C. § 3730(b).

1974

1975    23. Relator/Plaintiff be recover from Defendants, jointly and severally, all

1976        costs and expenses of this litigation, including statutory attorneys'

1977        fees and costs of court.

1978

1979    24. Pre-judgment and post-judgment interest, at the highest rate allowed

1980        by law.

1981

1982    25. All other relief on behalf of the Relator/Plaintiff or the United States

1983        Government to which they may be justly entitled, whether at law or

1984        inequity, and which the District Court deems just and proper.

1985

1986        26.Award costs or expenses of the suit.

1987

1988        27.Any other further relief as the Court deems just and appropriate.

1989

1990        Respectfully submitted,

1991        Dated: August 5, 2011

1992

1993
1994        **UNITED STATES OF AMERICA, ex rel.**
1995        **James M. Atkinson**
1996        31R Broadway
1997        Rockport, MA 01966
1998        (978) 546-3803